McKEEN v. DAVIS COKE & COAL CO.

(District Court, E. D. New York. July 23, 1901.)

SHIPPING—BREACH OF CHARTER—DELAY IN REACHING PORT OF LOADING.

A schooner chartered for loading at Baltimore, with privilege of taking a part cargo at New York, for ballast, to Baltimore, took on two kinds of cargo at different places, amounting in all to 432 tons, her cargo capacity being 900 tons. Owing to delay in obtaining part of the cargo, and to bad weather, she did not leave New York until 12 days after the charter was signed, and prior to her arrival in Baltimore the charterer gave notice that he would not accept her, claiming that she had violated the charter by delay to load more cargo than was required for ballast. *Held*, that under the terms of the charter she was entitled to a reasonable time, no time being stipulated, and that the amount of ballast required was a matter within the discretion of her master, having regard not only to her safety, but to her sailing qualities; that, in the absence of evidence showing that he had abused his discretion, or that there had been unreasonable delay, there was no breach of the charter which justified the charterer in refusing to accept the vessel.

In Admiralty. Suit to recover damages for breach of charter.

Wilcox, Adams & Green, for libelant.

Wing, Putnam & Burlingham, for respondent.

THOMAS, District Judge. On January 3, 1901, a charter was concluded at New York City for the schooner Thackara to carry a cargo of coal from Baltimore, Md., to Port of Spain, Trinidad, which contained the following stipulation:

"It is understood that vessel is now at New York, ready, and has privilege of taking part cargo at New York for ballast to Baltimore before entering upon this charter."

The schooner was unable to obtain certain cement—a portion of the cargo taken by her as ballast—until January 7th, and she finished loading the same at Weehawken on January 11th, between which dates she completed her crew, and went to an anchorage at Red Hook. There she was detained by bad weather until the 14th of January, when she went to Barren Island, and took on 175 tons of fertilizer, which, with the 257 tons of cement, constituted the cargo that she assumed to carry as ballast. On January 15th she went to sea, arrived at Baltimore January 28th, and discharged so as to be tendered to the charterers on February 4th. Meanwhile, after her arrival, her master received a letter, written by the charterers in New York to the vessel's agent, as follows:

"New York, Jan. 16th, 1901.

"Mr. Henry P. Havens, Agent, 85 West St., City—Dear Sir: Referring to our charter of the schooner Adele Thackara, dated Jan. 3rd, I beg to advise that the vessel has violated the terms of the charter in so much as she has not proceeded direct from New York to Baltimore. We learned to-day that she has reported at Barren Island for cargo in addition to the ballast which she was to take at New York. In view of this violation, we cannot accept

the vessel for loading under the terms of the present charter. Since our arrangement with you, rates on vessels from Baltimore to Trinidad have declined materially, and, unless you are willing to make concession on this rate, we must decline to load the vessel. Please acknowledge receipt, and advise what you propose doing. We are offered another vessel, which we shall take unless we have material concession from the rate named in the charter above referred to.

"Very truly yours,    F. Moore, Manager."

Thereafter, without waiver of right, the schooner, under another charter, and at reduced rates, carried the cargo to Port of Spain. The breach of the charter party by the schooner is pointed out in the ninth and tenth subdivisions of the answer, as follows:

"Ninth. As this respondent has since been informed and believes, the Adele Thackara, under said privilege, did take on board in New York, to carry to Baltimore, about 1,800 barrels of cement, weighing upwards of 256 tons, which weight of cement was ample for ballast of a schooner like the Thackara of 515 tons register. The Thackara was ready to leave New York harbor on January 14th, having all cement on board, which was sufficient cargo for ballast. She delayed in the harbor, while her agents, without the consent of this respondent, were negotiating for additional cargo, which they finally received in the shape of phosphate to be loaded at Barren Island, in Jamaica Bay, Queens county, Long Island. The vessel was still further detained awaiting the services of a tug to tow her to the place where phosphate was to be loaded, and did not finally leave New York harbor until on or about January 18th, proceeding thence to Barren Island, and there loading about 240 tons of phosphate, after which she proceeded for Baltimore. Having, by means of the ship news columns, ascertained this unauthorized deviation, this respondent immediately notified the libelant's agents thereof, and stated that thereby the terms of the charter had been infringed, and therefore the respondent would not load said vessel. Tenth. The Thackara, on reaching Baltimore, had first to unload this quantity of phosphate, which was being discharged on the 29th, 30th, and part of the 31st days of January, after which he discharged cement for ballast, which took to and including the 4th day of February. On tendering the schooner to the respondent on February 4th, the libelant was informed that respondent declined positively to load the schooner, which position it has always maintained."

It will be observed that the schooner was privileged from entering upon the charter party until she had taken part cargo at New York for ballast. There was no limitation of time, and so a reasonable time was allowable. Arrangements for the two items of cargo were perfected at about the time the charter was made. The time for securing and taking the cargo on board is not shown to be unreasonable. The cement could not be taken before January 7th, and the loading is not shown to have proceeded with culpable delay. Meantime, while waiting, the schooner went on dry dock, and was painted, and completed her crew. The answer does not allege lack of necessary painting or incompleteness of crew as breaches of the stipulation that the schooner was ready. When a party relies upon the breach of a condition of warranty, he usually must plead it. There is no evidence that the painting or procurement of crew was a cause of delay. The real question is whether there was a breach of the charter party in taking the cargo at Barren Island. That place is within the city of New York, and is regarded as within the description of the port of New York. There is more question concerning the reasonable necessity of taking the two lots of cargo. The schooner's capacity was 900 tons, and she took 432 tons of cargo for the purpose of

110 F.—37

ballast. Therefore the libelant's contention is that she could take 46 per cent. of her full tonnage under the provision of the charter party. The evidence shows that she could have gone with probable safety with either the cement or fertilizer, but that, being a dull sailer, she would sail poorly without the cargo taken. It is understood that the necessity for ballast has not only relation to the safety of the ship, but also that fitness for her due navigation is involved. In Weir & Co. v. Union S. S. Co., 9 Asp. (N. S.) 112-114, it is said:

"One ship will require more ballast and another less, and it is for the master to judge whether any, and what, ballast will be required by his ship during a proposed voyage, having regard to the nature of the proposed cargo."

The master would not be allowed to abuse his discretion. But it is not clear that he has done so in the present instance, and a breach of his contractual duty is not proven satisfactorily. It is considered that the schooner made suitable haste, in view of the detention necessitated in obtaining the ballast, and of the condition of the weather. The master stated that stormy weather prevented him from going to Barren Island, and the report shows that the wind reached far beyond a gale on January 12th and 13th. Much latitude must be given to the master's judgment, and the courts may not too nicely criticise his conclusions. It is difficult to escape the inference that the fall of rates influenced the charterer to accuse the schooner of delay and deviation. The libelant should have a decree for such damages as may be shown before the commissioner.